1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

BEVERLY MARIE ROBERTS,                                    Case No. 2:16-cv-01232-JCM-GWF

8
                                        Plaintiff,

9
        v.

10
NANCY A. BERRYHILL,                                       **REPORT AND RECOMMENDATION**
Acting Commissioner of Social Security,

11
                                        Defendant.

12

13          This matter is before the Court on Plaintiff's Motion for Reversal and/or Remand (ECF

14    No. 24), filed on December 20, 2016.  Defendant filed her Response (ECF No. 26) and Cross

15    Motion for Summary Judgment (ECF No. 27) on January 23, 2017.  Plaintiff filed her Reply

16    (ECF No. 28) on February 13, 2017.

17                                          **BACKGROUND**

18          **A.      Procedural History**

19          On May 10, 2012, Plaintiff Beverly Marie Roberts filed an application for a period of

20    disability, disability insurance benefits, and supplemental security income.  *See Administrative*

21    *Record* ("AR") 22.  The Commissioner denied Plaintiff's application initially on October 11,

22    2012 and upon reconsideration on August 15, 2013.  AR 139, 145.  Plaintiff requested a hearing

23    before an Administrative Law Judge ("ALJ").  AR 153.  A hearing was conducted on September

24    5, 2014 before the ALJ.  AR 27-42.  Plaintiff and a Vocational Expert, Alan E. Cummings,

25    appeared and testified at the hearing.  The ALJ found that Plaintiff was not disabled as defined in

26    the Social Security Act.  AR 34.  The Social Security Administration Appeals Council denied

27    Plaintiff's request for review on April 1, 2016 and Plaintiff filed this action for judicial review.

28

This matter has been referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

**B.      Factual Background**

**1.      Plaintiff's Disability/Work History Reports and Hearing Testimony**

Plaintiff was born on October 4, 1954.  AR 193.  At the time of the September 5, 2014 hearing, she lived with her daughter.  She has a high school diploma and a trade school license in cosmetology.  She also had a license to teach cosmetology.  AR 50-51.  In addition to working as a cosmetologist and teaching cosmetology, Plaintiff worked in a warehouse position.  AR 55.

Plaintiff claimed that she became disabled from work on December 1, 2010.  AR 193. She listed carpal tunnel syndrome, high blood pressure, arthritis, depression, and calluses on the feet as her disabling conditions.  AR 207.  Her pain and limitations became more severe in the summer of 2012.  AR 215.  She was very limited in lifting and carrying objects due to carpal tunnel syndrome, and had pain, tingling, and numbness in her hands.  In her July 22, 2013 function report, Plaintiff reported that it was sometimes difficult to hold objects such as a fork or a comb.  AR 222.  Standing sometimes caused pain in her feet due to "planter's warts."  AR 226. She had tendonitis in her right wrist.  She stated that her mobility and range of motion were very limited due to severe pain and stiffness.  AR 231.

Plaintiff testified at the September 5, 2014 hearing that she stopped working as a cosmetologist because her hands would lock around clippers or scissors.  The painful calluses or planter's warts on her feet also affected her ability to work.  AR 60.  She went to the emergency room for her hands and was given a brace.  AR 63.  She wore the brace 24 hours a day for several months until she was instructed by a physician to stop wearing it.  She did not have medical insurance.  AR 69.  She did not see a psychiatrist, psychologist, or therapist for any mental health condition.  AR 76.  Plaintiff stated that she had been diagnosed with Hepatitis C approximately a month before the hearing, and had not yet begun medical treatment for that condition.  AR 62.

Plaintiff testified that she was able to care for her own hygiene.  AR 70.  Approximately once a month, she would awake with throbbing hands which caused her to drop objects.  She

drove an automobile once or twice a month to her sister's home or to the store to pick up medicine.  AR 71.  Plaintiff was sometimes able to cook for herself.  AR 72.  Her daughter performed the household cleaning, but she was sometimes able to wipe counter-tops, make the bed, or fold laundry.  She testified that she could lift five or ten pounds, sit comfortably for an hour, stand for 45 minutes, and walk for 15 minutes.  AR 75.

Under questioning by her attorney, Plaintiff testified that she would stand between 10 and 12 hours a day while working as a full-time cosmetologist.  AR 77.  When doing household chores, she would take breaks of an hour to an hour and a half.  She experienced numbness in her hands and pain in her feet every day.  AR 78.  Plaintiff testified that she previously enjoyed gardening and teaching her students, but was no longer able to perform such activities due to her pain and limitations.  AR 79.

### 2. Vocational Expert's Testimony

The vocational expert classified Plaintiff's past work as a cosmetologist and instructor in cosmetology as light, skilled work.  Her employment as a warehouse worker was medium, unskilled work.  AR 82.  The ALJ asked the vocational expert the following hypothetical question:

> If you were to assume a hypothetical individual of the same age, education, and work history as the Claimant, who is capable of light work, would need the opportunity to change position at the workstation once every two hours, otherwise regular, normal breaks, a mid-morning break, lunch break, and afternoon breaks, as required by state and federal statutes, labor laws, would that hypothetical individual be capable of the Claimant's past work?

AR 83.

The vocational expert testified that the hypothetical individual would be able to perform Plaintiff's past work as a hair stylist and vocational instructor, but not her past work as a warehouse worker.  Plaintiff's counsel asked whether Plaintiff had transferrable skills at the light exertional level to other light or sedentary work.  The vocation expert testified that she did not.  AR 84.  Counsel asked whether the hypothetical individual would be able to perform Plaintiff's past work if she was required to take two additional unscheduled breaks lasting 15 to 20 minutes

3

per work shift, and would miss one day a week of work due to pain or fatigue. The vocational expert testified that these additional work limitations would preclude full-time employment.

### 3.    Medical Records and Reports

Plaintiff was seen at a hospital emergency room in Vacaville, California on June 26, 2010 for abdominal pain with nausea and vomiting. She was admitted with the working diagnosis of gastroenteritis and hyperkalemia (higher than normal potassium level in the blood) and was discharged on June 28, 2010 with a diagnosis of urinary tract infection and abdominal pain of unknown etiology. AR 249-252. She was seen at NorthBay Hospital in Fairfield California on April 20, 2012 for complaints of abdominal pain. The impression on discharge was also a urinary tract infection. AR 283-286. She was again seen at NorthBay Hospital on July 17, 2012 for complaints of rectal bleeding and mild low back pain. She stated that she worked in a warehouse where she had to move a lot of boxes and she attributed her low back pain to her work. AR 289. She was given a differential diagnosis of hemorrhoids, AVM, diverticulitis and UC. AR 290.

On October 1, 2012, a state agency medical consultant, Dr. Lee, found that Plaintiff had not submitted sufficient medical evidence to support her claim of disability based on carpal tunnel, high blood pressure, arthritis and depression. AR 87-90.

Dr. Casimir Chukwuemeka Okoro performed a disability examination of Plaintiff on July 3, 2013 at the request of Disability Determination Services. The examination took place while Plaintiff was residing in Georgia.[1] AR 337-343. Plaintiff's chief complaints at the time of the examination were bilateral hand and wrist pain, high blood pressure, diverticulitis, arthralgia and callus formation on both feet. She stated the wrist pain and hand numbness developed while she worked as a barber/hairdresser, and made it uncomfortable for her to do her job. Her foot callus also caused pain when she stood too long. AR 341. Dr. Okoro noted that Plaintiff was alert, oriented, comfortable, and cooperative. She ambulated without support and was not in

---

[1]Plaintiff testified that she briefly moved to Georgia in 2013 because her daughter was going to school there. The schooling did not work out and Plaintiff and her daughter returned to California. AR 68-69.

acute distress. Plaintiff had normal range of motion in all joints and there was no swelling or deformity. Psychologically, she had appropriate mood and affect, and was oriented times 3. In regard to her complaints of carpal tunnel syndrome, callus formation and generalized body/point pain, Dr. Okoro stated that she "would benefit from specific treatments for these conditions to prevent any significant negative effects on activities of daily living." He also recommended lifestyle changes, including a high fiber diet, to reduce the occurrence of pain and bleeding from diverticulosis. He stated that use of a wrist splint and nonsteroidal anti-inflammatory medication should be considered for pain management, and that Plaintiff should be referred to a foot clinic for her calluses. AR 342.

Dr. Okoro completed a form regarding Plaintiff's strength and range of movement. He stated that pain in both wrists had no significant effect on her ability to grip and pinch. She had normal strength in the proximal and distal upper and lower extremities. Plaintiff had normal gait and station, and she did not require a walking aid. The callus formation did not affect her walking. AR 339. He stated she was "able to carry most activities with both hands" and that there was no immediate problem with carpal tunnel syndrome. AR 340.

On August 6, 2013, a state agency physician, Dr. Abraham Oyewo, evaluated Plaintiff's medical records and opined that her calluses were a non-severe impairment. He also stated that there were normal examination findings regarding grip and pinch, and normal gait and station. Dr. Oyewo stated that while Plaintiff's medically determinable impairments could be expected to produce her symptoms and functional limitations "to a measured degree," her statements about the severity of her symptoms were only partially credible because they were not consistent with the objective medical findings. AR 120.

On August 14, 2013, state agency physician Sylvia Robles-Meyers, M.D. performed a psychiatric review technique. She noted that Plaintiff alleged that she suffered from depression and was diagnosed with depression by Dr. O'Connor in July 2010. Dr. Robles-Meyers also noted that Dr. Okoro reported that Plaintiff denied depression and that she had appropriate mood and affect and was oriented "X3." Plaintiff had no problems with personal care as it relates to

her psychological condition.  Dr. Robles-Meyers concluded that Plaintiff's psychological

impairments were not severe.  AR 121-122.

While in Georgia, Plaintiff was seen at the Southern Regional Medical Center emergency

room on August 22, 2013 for right wrist and thumb pain.  AR 344.  Her pain radiated from the

right thumb upward to her right shoulder.  She was diagnosed with De Quervain's Tenosynovitis

and was discharged with the recommendation to see an orthopedic surgeon.  AR 346.

Upon returning to California, Plaintiff was seen by a physician's assistant ("PA") at

Peach Tree Healthcare in Marysville, California on October 14, 2013.  She reported that she had

been seen at the emergency room on August 22, 2013 for significant pain in her right wrist and

thumb, and had been wearing a wrist brace almost continuously since that time.  She was taking

Aleve which provided mild pain relief, but reported that she was having increased pain since the

ER visit.  AR 347.  On examination of the right upper extremity, the PA stated that she did not

have pain with palpitation over the wrist and dorsum of her right thumb.  There were positive

Tinel's and Phalen's signs at the right wrist.  There was a negative Tinel's sign at the elbow.

Plaintiff had pain with extension of thumb against resistance.  Under Neuropsychiatric

evaluation, the PA noted that Plaintiff was appropriate, alert, and oriented to person, place, time

and situation.  Her gait was normal.  The PA's assessment was right carpal tunnel syndrome and

tendinitis of the thumb.  He discussed with Plaintiff her present concerns and problems.  The PA

stated that Plaintiff was to "[c]ontinue to work on obtaining insurance.  When that occurs we will

consider nerve conduction EMG of right upper extremity."  He also stated that consideration

would be given to referring Plaintiff to a hand surgeon.  AR 350.

Plaintiff subsequently obtained medical insurance coverage through the Kaiser

Permanente Medical Group.  She was seen and treated at Kaiser Permanente in Sacramento,

California from March 4, 2014 to September 8, 2014, which is the last date for which records

were provided.  AR 353-434.  On April 10, 2014, Plaintiff reported to the physician that her

chief complaint was carpal tunnel syndrome.  She stated that it began with aching of the wrists.

She stated that she was a cosmetologist and her hand would cramp closed.  She was given a wrist

splint which she wore during the day.  AR 358.  The physician noted that her right wrist was in a

splint with thumb spica. There was mild tenderness of the medial and lateral aspects of the wrist. Plaintiff did not have the exquisite tenderness of "deQuervain's tendonitis." There was no pain with resisted abduction or adduction of the right thumb. Tinel's and Phalen's were negative. Plaintiff had full range of motion of the wrist with mild pain. AR 359. She complained of bilateral foot pain, which she described as a "burning coal type of pain" on the bottom of her feet when walking. AR 359. The physician noted that there were three corns on the bottom of her foot at the base of the first metatarsal, bunion area, and bunionette area. X-rays of Plaintiff's right wrist were taken and no significant abnormality was found. AR 362.

Plaintiff saw Dr. Michael Vance, an orthopedic surgeon, on April 24, 2014. AR 370. Dr. Vance noted that Plaintiff presented for evaluation of right hand and wrist pain that she had had "since last summer." She reported that her symptoms began while cutting hair and she attributed her pain to repetitive motions. She described the pain in her hand as paresthesias (pins and needles) in the radial palm, index and middle fingers. She often experienced painful cramping with activity or upon awakening. The pain would wake her up. She reported intermittent numbness in the thumb and through the middle fingers. She had no symptoms in the small finger. The symptoms were exacerbated by driving, and there had been no improvement with prolonged bracing. AR 370.

Dr. Vance found on physical examination that Plaintiff had full wrist and digital range of motion. The skin was intact and there was no swelling, effusion or atrophy. Sensation was decreased in her thumb, index, and middle fingers. Sensation was grossly intact in the radial and ulnar distributions. Tinel's sign was positive at the wrist with paresthesias in the thumb. Durkan's carpal compression test was also apparently positive with numbness in the palm and radial digits. There was negative Tinel's sign along the median nerve. There was tenderness to palpation along the first dorsal compartment with positive Finklesteins test. AR 371. Dr. Vance's initial diagnosis was right DeQuervain's tenosynovitis and carpal tunnel syndrome. He stated that nerve conduction studies would be obtained and he would plan for surgical release if the findings matched the clinical symptoms. For DeQuervain's tenosynovitis, Dr. Vance recommended heat/ice and activity modification. He offered Plaintiff a steroid injection, but she

preferred to wait until after the nerve conduction studies because the steroid injection might otherwise delay surgery.  AR 372.

Electrodiagnostic nerve conduction studies were performed on April 30, 2014.  The studies were assessed as normal with no nerve conduction study evidence to suggest right median or ulnar neuropathy.  It was recommended that a work-up be considered to rule out inflammatory arthritis.  AR 379.

Dr. Vance saw Plaintiff on May 23, 2014 and discussed the results of the nerve conduction studies.  He also discussed further diagnosis and treatment.  Plaintiff stated that her primary issue was cramping in the hand.  She reported "that she now has similar cramping in he feet and legs."  She continued to have intermittent numbness and radiating paresthesias in the volar forearm and palm.  Her right-sided wrist pain was slightly improved, but continued to limit her grip and lifting.  It was painful to use her thumb.  AR 381.  Dr. Vance's assessment was right DeQuervain's tenosynovitis, mild flexor tendinitis.  He stated that the previous suspicion of carpal tunnel syndrome was "less likely given similar cramping elsewhere and normal nerve conduction studies."  Dr. Vance discussed the treatment options at length with Plaintiff, including non-operative versus surgical management.  He stated that carpal tunnel surgery was not recommended in view of the nerve conduction studies.  He offered a carpal tunnel injection as a diagnostic test which Plaintiff declined.  In regard to the DeQuervain's tenosynovitis, he recommended continued heat/ice and activity modification.  He also performed a steroid injection and scheduled Plaintiff for follow-up in 6-8 weeks.  AR 382.

On June 6, 2014 Plaintiff reported to her primary care physician that she continued to have wrist pain.  She also complained of cramping of the hands, feet and legs bilaterally which was worse at night.  AR 385.  Her hands would cramp up after mopping, and her fingers would cramp after cutting hair.  She also complained of burning feet.  AR 385.  On June 30, 2014, Plaintiff presented for an ultrasound of her liver, which showed a small nodule.  AR 410.  A CT scan of her abdomen showed no early arterial enhancement of the lesion and, therefore, it was determined to be likely benign.  AR 413.  On August 26, 2014, Plaintiff attended an information class on her recent diagnosis of hepatitis C.  AR 428.

### C.    ALJ's Decision.

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration, 20 CFR 416.920(a), to determine whether Plaintiff was disabled.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, December 1, 2010.  She also stated that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2016.  AR 24.

At step two, the ALJ found that Plaintiff had the following medically determinable impairments: DeQuervain's tenosynovitis and hepatitis C.  She found, however, that these impairments did not significantly limit Plaintiff's ability to perform basic work activities and therefore were not "severe" impairments, either separately or in combination.  AR 24-25.  The ALJ provided an extensive summary and analysis of Plaintiff's symptoms and medical treatment in support of this finding.  AR 25-31.

The ALJ stated that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not generally credible because they were "inconsistent with the objective medical evidence, which can indicate an attempt by the [Plaintiff] to exaggerate the severity of her symptoms."  Diagnostic findings regarding her right hand were generally unremarkable.  X-rays showed no significant abnormality, and electromyogram and nerve conduction studies were unremarkable and within normal limits.  The disability examination performed by Dr. Okoro in July 2013 resulted in normal findings regarding Plaintiff's grip and motor strength for both hands, and the upper and lower extremities.  AR 27.

The AL stated that Plaintiff did not receive the type of medical treatment that would be expected for a totally disabled individual.  AR 27.  She had relatively infrequent visits to a doctor for her allegedly disabling symptoms.  There were no records of medical treatment between September 2010 and April 2012, or between April 2012 and July 2013.[1]  The ALJ also characterized her treatment in 2013 and 2014 as rather intermittent, generally routine, and

---

[1] Plaintiff was seen at the hospital in April 2012 for complaints of abdominal pain.  The ALJ apparently overlooked her subsequent hospital visit in July 2012 for rectal bleeding and mild low back pain. AR 289.

conservative treatment consisting of "some prescribed medications and recommendations to heat/ice her reportedly affected right hand and wrist." The ALJ stated that this infrequent pattern of treatment was inconsistent with the alleged severity of Plaintiff's functional limitations. AR 28.

The ALJ stated that Plaintiff "attempted to minimize her daily activities." She found that Plaintiff's daily activities were not limited to the extent one would expect, considering the alleged severity of her symptoms and limitations. The ALJ noted that Plaintiff was able to care for her personal hygiene, prepare meals, hold on to a steering wheel and drive to run errands, and perform household chores, such as wiping counter-tops, making the bed, and folding laundry. AR 28.

After discussing Plaintiff's limited medical treatment history between June 2010 and April 2014, and the disability evaluation performed by Dr. Okoro in July 2013, AR 28-29, the ALJ discussed the medical appointment as Kaiser Permanente in April 2014 regarding possible carpal tunnel syndrome, and the physician's finding of "mild tenderness of the medial and lateral aspects of the right wrist, but not the exquisite tenderness of De Quervain's tendinitis." AR 29. At the time of that examination, Plaintiff had full range of motion of the right wrist with mild pain. The ALJ also summarized Dr. Vance's findings regarding De Quervain's tenosynovitis and possible carpal tunnel syndrome and the subsequent electromyogram and nerve conduction studies which essentially ruled out the diagnosis of carpal tunnel syndrome. AR 29.

In determining that Plaintiff's medically determinable impairments were non-severe, the ALJ gave substantial weight to the opinions of the state agency medical consultants. AR 30. She found that the medical record failed to provide sufficient, objective evidence to substantiate Plaintiff's symptoms and limitations related to her hands. Her condition appeared to have been managed medically. Aggressive treatment was not recommended. Although Plaintiff was diagnosed with hepatitis C in June 2014, there was no evidence of medical treatment for that condition.

The determination that a claimant's medically determinable impairments are not severe results in a conclusion that claimant is not disabled within the meaning of the Social Security

Act.  The ALJ, however, proceeded to make an alternative disability determination under the subsequent steps of the sequential process.  Consistent with the finding that Plaintiff's impairments were not severe, the ALJ found at step three that none of Plaintiff's impairments were sufficient to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  AR 31.

Prior to step four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she would need the opportunity to change positions at her workstation every two hours.  She would need regular breaks in the mid-morning, for lunch, and in the afternoon as required by state or federal labor laws.  AR 31.  The ALJ's determination that Plaintiff was able to perform light work was substantially based on the same findings that supported her determination that Plaintiff's impairments were not severe.  The ALJ again found that Plaintiff's allegations regarding the severity of her limitations were not generally credible.  AR 32.  At this step the ALJ gave "limited weight" to the opinions of the state agency medical consultants, AR 32, as distinct from the "substantial weight" she gave those opinions at step two.  AR 30.

Based on her finding that Plaintiff had the ability perform light work, and the vocational expert's testimony regarding her past jobs as a cosmetologist and vocational (cosmetology) instructor, the ALJ found that Plaintiff could perform those jobs.  The ALJ therefore concluded that Plaintiff was not disabled at any time between December 1, 2010 and the date of the decision.  AR 34.

## DISCUSSION

### I.    Standard of Review

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D.

Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based."  *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

## II.    Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that (a) he/she suffers from a medically determinable physical or mental impairment that can be

1    expected to result in death or that has lasted or can be expected to last for a continuous period of

2    not less that twelve months; and (b) the impairment renders the claimant incapable of performing

3    the work that the claimant previously performed and incapable of performing any other

4    substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d

5    1094, 1098 (9th Cir. 1999). The claimant has the initial burden of proving disability. *Roberts v.*

6    *Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant

7    establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to

8    show that the claimant can perform other substantial gainful work that exists in the national

9    economy. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

10        Social Security disability claims are evaluated under a five-step sequential evaluation

11   procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.

12   2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*,

13   180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any

14   point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). The

15   five steps of the evaluation process are correctly outlined in the ALJ's decision and will not be

16   repeated here.

17        **III.    Analysis and Findings.**

18        Plaintiff argues that the ALJ failed to apply the proper standard in determining that her

19   medically determinable impairments were not severe, and also improperly discounted the severity

20   of her alleged symptoms based on her alleged failure to pursue medical care, and her alleged ability

21   to perform activities of daily living. Plaintiff carries the initial burden of establishing that she has

22   a medically determinable impairment which could reasonably be expected to produce the pain or

23   other symptom alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). The claimant is

24   not required produce objective medical evidence of the pain itself. Nor must she produce objective

25   medical evidence of the causal relationship between the medically determinable impairment and

26   the symptom. She does not have to show that the impairment could reasonably be expected to

27   cause the severity of the symptom alleged. She is only required to show that it could reasonably

28   cause some degree of the symptom. *Id.*

1    An impairment or combination of impairments may be found not severe only if the

2  evidence establishes a slight abnormality that has no more than a minimal effect on an

3  individual's ability to work. *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005) (citing

4  Smolen, 80 F.3d at 1290. "[I]f an adjudicator is unable to determine clearly the effect of an

5  impairment or combination of impairments on the individual's ability to do basic work activities,

6  then the sequential evaluation should not end with the not severe evaluation step." *Id.* (quoting

7  S.S.R. No. 85–28 (1985)). Step two is "a de minimis screening device used to dispose of

8  groundless claims. An ALJ may find that a claimant lacks a medically severe impairment or

9  combination of impairments only when the conclusion is "clearly established by medical

10  evidence." In reviewing such a determination, the court must decide whether the ALJ had

11  substantial evidence to find that the medical evidence clearly established that the claimant did

12  not have a medically severe impairment or combination of impairments. *Id.* at 687.

13    Plaintiff complained to physicians about wrist and hand pain from at least July 3, 2013,

14  when she was examined by Dr. Okoro, through May 2014, when Dr. Vance made a definitive

15  diagnosis of DeQuervain's tenosynovitis and ruled out carpal tunnel syndrome.[2]  Plaintiff

16  reported that her hand and wrist symptoms were caused by the repetitive movements that her job

17  as a cosmetologist required. She claimed that these symptoms made it difficult for her to use

18  clippers or scissors. Plaintiff stopped working as a cosmetologist by the end of 2010, however.

19  The medical records are unclear as to whether Plaintiff would reasonably still be experiencing

20  hand and wrist symptoms more than 2 or 3 years after she stopped working.

21    Contrary to the Commissioner's argument, Plaintiff's complaints of wrist and hand pain

22  and numbness were supported by objective medical findings. An emergency room physician

23  diagnosed Plaintiff's right hand pain as DeQuervain's tenosynovitis on August 22, 2013. This

24  condition was more conclusively diagnosed by Dr. Vance, an orthopedic surgeon, in April 2014.

25  According to the Mayo Clinic website, DeQuervain's tenosynovitis is a painful condition

26

27    [2] Plaintiff was diagnosed with left hand tendonitis and arthritis by Dr. William T. O'Connor on June 7,
2010. AR 276. There does not appear to be another medical record documenting hand or wrist pain until
28  July 2013, when her symptoms primarily involved the right hand and wrist.

affecting the tendons on the thumb side of the wrist, and will probably hurt when the person

turns the wrist, grasps anything, or makes a fist.  Symptoms include pain or swelling near the

base of the thumb, difficulty moving the thumb and wrist when doing something that involves

grasping or pinching.  It may also cause a "sticking" or "stop-and-go" sensation when moving

the thumb.  *See* Mayo Clinic, www.mayoclinic.org/diseases-conditions/de-quervains-

tenosynovitis (accessed by the Court on May 4, 2018).  The condition is diagnosed by applying

pressure to the thumb side of the wrist which causes pain.  The physician also performs the

"Finkelstein test" in which the patient bends her thumb across the palm and bends her fingers

down over the thumb.  The patient then bends her wrist toward the small finger.  If this causes

pain on the thumb side of the wrist, the condition is confirmed.  Imaging tests, such as x-rays, are

not generally needed to diagnose DeQuervain's tenosynovitis.  *Id.*  Dr. Vance noted that there

was a positive Finkelstein test on April 24, 2014.  AR 371.

   The symptoms that Plaintiff reported prior to that diagnosis are consistent with

DeQuervain's tenosynovitis.  She, therefore, met her burden at step two to show that she had an

objectively determinable medical impairment that could cause her symptoms of pain, numbness

and locking up of the right wrist and hand.  Moreover, the ALJ determined that Plaintiff had the

medically determinable impairment of DeQuervain's tenosynovitis.  AR 24.  To the extent that

the Commissioner argues that Plaintiff failed to meet her burden to show a medically

determinable impairment that could have caused her symptoms, that argument is rejected.

   The ALJ is not required to believe every allegation of disabling pain or other non-

exertional impairment.  The ALJ must, however, provide specific, cogent reasons for

disbelieving the claimant's testimony when a medical impairment has been established.  If there

is no affirmative evidence of malingering, the ALJ's reasons for rejecting the claimant's

testimony must be clear and convincing.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007);

*Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

   The ALJ discussed Plaintiff's limited medical treatment and significant time gaps in

treatment which she characterized as "inconsistent with the alleged severity of the functional

limitations imposed by claimant's purported impairments and further diminishes the credibility

1    of her allegations." AR 27-28. Plaintiff argues that this finding is invalid because it disregards

2    Plaintiff's lack of medical insurance and the fact that once she acquired insurance, she actively

3    pursued treatment for her symptoms.[3] *See* AR 69, 350. Ninth Circuit case law "makes clear that

4    if a claimant complains about disabling pain but fails to seek treatment, or fails to follow

5    prescribed treatment, for pain, an ALJ may use such failure as a basis for finding the complaint

6    unjustified and exaggerated." *Orn*, 433 F.3d at 638. A claimant's failure to receive medical

7    treatment during the period that she had no medical insurance, however, cannot support an

8    adverse credibility finding. *Id.* "'Disability benefits may not be denied because of the claimant's

9    failure to obtain treatment he cannot obtain for lack of funds.'" *Id.* (quoting *Gamble v. Chater*,

10   68 F.3d 319, 321 (9th Cir. 1995)). The ALJ's finding that Plaintiff's failure to pursue more

11   frequent or regular medical treatment discredited her testimony regarding the severity of her

12   symptoms was not a valid credibility determination.

13           The ALJ was on more solid ground in stating Plaintiff's complaints of disabling pain and

14   other symptoms, were inconsistent with the objective medical findings on examination. The ALJ

15   noted, for example, that Dr. Okoro stated in July 2013 that Plaintiff exhibited normal grip and

16   strength at the bilateral hands, upper extremities, and lower extremities, and that she was able to

17   carry out most activities with both hands and had no immediate problems related to carpal tunnel

18   syndrome. AR 27. Dr. Okoro also stated that Plaintiff had a normal gait and station, did not

19   require a walking aid, and the callus formation did not affect her walking. AR 29. Once

20   Plaintiff was diagnosed with DeQuervain's tenosynovitis, she was treated with ice/heat and

21   received a steroid injection. The ALJ found that "this condition was being managed medically

22   and should be amenable to proper control by adherence to recommended medical management

23   and medication compliance. No aggressive treatment was recommended or anticipated for

24   claimant's right upper extremity." AR 30. These findings provide some support for the

25   conclusion that Plaintiff's impairments or conditions did not cause severe pain or other

26   limitations.

27           Plaintiff also argues that the ALJ's discussion of her daily activities was both cursory and

28   _____

[3] Plaintiff also testified that she lived on a Veteran's widow pension of $1,250.00 per month.

highly selective.  The ALJ stated that Plaintiff "attempted to minimize her daily activities," and that she described activities of daily living which were not limited to the extent that one would expect given her complaints of disabling symptoms and limitations.  The ALJ stated that Plaintiff was able to care for her personal hygiene needs, such as her hair.  She was able to prepare herself meals.  She could perform household chores such as wiping countertops, making her bed and folding laundry.  She could hold a steering wheel and drive herself on errands such as picking up medications or visiting her sister.  AR 28.

The Court is required to carefully scrutinize credibility findings based on alleged inconsistencies between a claimant's ability to perform activities of daily living and her complaints of severe pain or other disabling limitations.  "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Garrison v. Colvin*, 759 F.3d at 1016 (quoting *Smolen*, 80 F.3d at 1287 n.7).  Only if a claimant's level of activity is inconsistent with her claimed limitations would these activities have any bearing on her credibility.  *Id.* (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).  The court in *Garrison* held that the ALJ made two errors in discounting the claimant's credibility based on her ability to engage in activities of daily living.  First, the ALJ mischaracterized the claimant's testimony regarding the extent to which she could engage in various activities of daily living.  Second, the ALJ erred in finding that the activities, if performed as the claimant described, would be inconsistent with her description of pain related impairments.  *Id.* at 1016.

In this case, the ALJ's reasons for rejecting the credibility of Plaintiff's testimony based on her activities of daily living also fall short of being clear and convincing.  Plaintiff significantly qualified her ability to engage in activities of daily living.  She stated that she could "sometimes" take care her own hygiene, depending on her level of pain.  She stated that the throbbing pain in her hand sometimes made it hard for her to brush her teeth.  This occurred approximately once a month.  AR 70.  She stated that she sometimes drove an automobile.  AR 71.  She also testified that she could sometimes clean countertops, make her bed or fold laundry.

AR 72.  Plaintiff's testimony regarding her ability to perform activities of daily living was not inconsistent with her descriptions of pain, numbness and the locking up of her hands.  Her description of her ability to engage in the foregoing activities was not contrary to her assertion that she could no longer work as a cosmetologist or cosmetology instructor because the pain in her hands and wrists made it difficult to hold objects needed to perform those jobs.

The medical records and testimony are vague as to Plaintiff's alleged symptoms and limitations caused by the calluses on her feet.  She reported episodes of pain from these conditions, but there is a lack of evidence that this condition significantly interfered with her ability to stand and walk.  Similarly, Plaintiff failed to present evidence that she suffers from a disabling level of depression or other mental impairment.  The record, at most, indicates that she suffered from occasional episodes of depression.   The ALJ's apparent determination that these conditions did not constitute severe medical impairments was not erroneous.

The ALJ did not have substantial evidence to support her finding that Plaintiff's right hand and wrist pain and numbness resulting from DeQuervain's tenosynovitis was not a severe impairment.  Her finding was predicated in significant part on two improper credibility determinations—Plaintiff's alleged failure to pursue or obtain regular medical treatment and the alleged inconsistencies between her activities of daily living and her complaints of severe pain and numbness in the hands and wrists.

The ALJ made an alternative finding at step four of the sequential process that Plaintiff was able to perform her past relevant work as hairstylist (cosmetologist) and vocational instructor (teaching cosmetology) based on a residual functional capacity to perform work at the light exertional level with the opportunity to change positions at the work station once every two hours.  AR 32-33.  The ALJ based this determination on the same fact that she relied on in finding that Plaintiff did not have a severe medical impairment:  (1) The medical evidence showed unremarkable diagnostic findings—x-rays, electromyogram and nerve conduction studies, and no significant abnormalities in the right upper extremity; (2)  infrequent medical treatment for the alleged symptoms, with significant gaps in treatment; (3) claimant's ability to engage in activities of daily living that were inconsistent with her complaints of severe

1   symptoms.   AR 32.  For the reasons discussed above, the ALJ's second and third grounds for

2   her assessment were not proper findings.

3        The ALJ was correct that most of the diagnostic and examination findings were normal or

4   negative.  A diagnosis of DeQuervain's tenosynovitis was confirmed, however, by Dr. Vance in

5   April 2014, and that condition could have caused Plaintiff's right hand pain, numbness and

6   locking-up.  The ALJ failed to provide adequate analysis to support the conclusion that Plaintiff

7   had the ability to perform her past work as a hairstylist (cosmetologist) or vocational instructor.

8        20 CFR § 404.1567 (b) states that "[l]ight work involves lifting no more than 20 pounds

9   at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the

10  weight lifted may be very little, a job is in this category when it requires a good deal of walking

11  or standing, or when it involves sitting most of the time with some pushing and pulling of arm or

12  leg controls.  To be considered capable of performing a full or wide range of light work, you

13  must have the ability to do substantially all of these activities."  Plaintiff claimed that she had

14  difficulty holding objects, such as a comb, scissors or clippers and that her hand locked-up when

15  she used clippers.  While Plaintiff may have had the residual functional capacity to perform a

16  variety of light work, it is questionable whether she had the ability to work full time as a

17  hairstylist (cosmetologist) which required her to continuously use combs, scissors and clippers.

18  The record is unclear regarding the extent to which Plaintiff was required to use her hands as a

19  cosmetology instructor.  Presumably, she would be required to use her hands to demonstrate

20  various hairstyling techniques, but not to the same extent as a full time hairstylist

21  (cosmetologist).  The Court, therefore, concludes that the ALJ's determination that Plaintiff had

22  the residual functional capacity to perform her past work as a hairstylist (cosmetologist) or

23  vocational instructor is not supported by substantial evidence.

24       The court may remand a case with instructions to calculate and award benefits if (1) the

25  record has been fully developed and further administrative proceedings would serve no useful

26  purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence,

27  whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence

28  were credited as true, the ALJ would be required to find the claimant disabled on remand.

1    *Garrison*, 759 F.3d at 1020.  The court, however, is not required to apply the "credit-as-true

2    rule" if an evaluation of the record as a whole creates serious doubt as to whether the claimant is,

3    in fact, disabled within the meaning of the Social Security Act.  *Id.*  Even when all three

4    requirements of the "credit-as-true" rule are present, the court has the discretion to follow the

5    ordinary remand rule which allows the agency to rehear or reconsider the disability

6    determination.  *Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir.

7    2014).

8           Plaintiff requests that this matter be remanded "for a rehearing, i.e., for further

9    administrative proceedings to determine whether she was disabled within the meaning of the

10   Social Security Act between December 2010 and the date of the ALJ's decision.  *Motion for*

11   *Reversal and/or Remand* (ECF No. 25) at 19-20.  Even without this request, the Court

12   recommends that this case be remanded for further administrative determination of disability

13   because the record, as a whole, raises serious doubt as to whether Plaintiff was disabled.

14          As noted by the ALJ, the medical evidence showed unremarkable diagnostic findings

15   with respect to Plaintiff's right hand and wrist.  Plaintiff stopped working as cosmetologist and

16   instructor in December 2010.  It is unclear whether Dr. Okoro was informed that Plaintiff had not

17   worked as a hairdresser for over two and a half years.  Plaintiff reported to Kaiser Permanente in

18   April 2014 that she "is a cosmetologist and her hand will cramp closed."  AR 358.  There is no

19   indication that she informed the medical providers at Kaiser Permanente, including Dr. Vance,

20   that she had not worked as a cosmetologist for more than 3 years.  Whether the information that

21   Plaintiff had not worked as a cosmetologist for over three years would have affected the

22   physicians' assessment of her right wrist and hand symptoms is unknown.  Given the uncertainty

23   as to when Plaintiff's right wrist and hand pain began and whether it continued to bother her to

24   the extent claimed over three years after she stopped working, raises serious doubt as to whether

25   she was disabled due to symptoms from DeQuervain's tenosynovitis.  Accordingly,

26   . . .

27   . . .

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and/or Remand (ECF No. 24) be **granted** and that the Commissioner's Cross Motion for Summary Judgment (ECF No. 27) be **denied**.

**IT IS FURTHER RECOMMENDED** that this matter be remanded to the Social Security Administration for further hearing and determination as to whether Plaintiff was disabled within the meaning of the Social Security Act.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. Appeals may been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

Dated this 15th day of May 2018.

_____
GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE